FILED
03 OCT 23 PM 3:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARY HOFFMAN, )
)
    Plaintiff, )
)
vs. ) Case No. CV-03-TMP-214-S
)
UNITED STATES STEEL AND )
CARNEGIE PENSION FUND, )
)
    Defendant. )

ENTERED
OCT 23 2003

## MEMORANDUM OPINION

    This is an action under the Employee Retirement Income Security Act ("ERISA") in which the plaintiff seeks prescription drug benefits under the defendant's "mail order option." Defendant has responded that, because the particular drug sought by plaintiff cannot be supplied by its mail-order prescription drug manager due to lack of FDA approval, the mail order option is not available and plaintiff must resort to the more expensive pharmacy option. On April 15, 2003, both parties filed cross motions for summary judgment, which have been fully briefed and argued. The parties have consented to the exercise of dispositive authority by the undersigned pursuant to 28 U.S.C. § 636(c).

### I. Summary Judgment Standards

    Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always

bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. National Labor Relations Board, 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industry Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

Because this case is before the court on cross motions, the court must view the evidence most favorably to the plaintiff when reviewing the defendant's motions, and the opposite when reviewing

3

plaintiff's motion. Applying those standards first to the defendant's motion, the following summary of facts is taken from the evidence in a light most favorable to the plaintiff.

## II. Facts

Plaintiff is a 71-year old, part-time secretary and the wife of a retired employee of United States Steel ("USS"). As such, she is a participant in USS's retiree health benefit program, the United States Steel and Carnegie Pension Fund ("Fund"). She suffers from a severe and progressive illness known as primary pulmonary hypertension ("PPH"), which is a rare and difficult condition to treat. If not treated successfully, PPH can be fatal. Plaintiff's doctors have recommended a course of treatment with Tracleer, a medication manufactured by Actelion, Ltd, and regulated by the Food and Drug Administration. Because Tracleer has profound side effects, the FDA has approved its distribution only through a limited distribution network, called the Tracleer Access Program. Only three specialty distributors have been chosen for distribution of Tracleer; these are CVS-ProCare, Caremark, and Acredo (formerly Gentiva and Nova Factor, which have merged). The monthly wholesale cost for Tracleer is approximately $3,000.00.

Health benefits are provided to USS retirees and their spouses through the United States Steel Corporation Plan for Employee Insurance Benefits (Revision of 1950), ("Benefits Plan") as later amended over the years. The administrator of the Benefits Plan is defendant United States Steel and Carnegie Pension Fund ("The Fund"), a non-profit Pennsylvania corporation, separate from USS. Benefits are paid from a trust known as the Voluntary Employee Benefits Association ("VEBA") to which USS makes a defined contribution. The Fund also is the trustee of the VEBA, and it is reported that the trust administered by the Fund has over $7.2 billion in assets. The Fund is governed

4

by an eleven-member Board of Directors, at least five of whom are officers of USS (including their positions with USS): James D. Garraux (Vice President-Employee Relations), John P. Surma (President and Chief Operating Officer), Dan D. Sandman (Vice Chairman and Chief Legal & Administrative Officer, General Counsel, and Secretary), Gretchen R. Haggerty (Executive Vice President, Treasurer, and Chief Financial Officer), and Larry G. Schultz (Vice President and Controller). The evidence does not reveal the relationship, if any, to USS of the remaining six members of the Fund's Board. The Fund has been granted expressly the discretionary authority to interpret the Plan and decide all questions of eligibility.

Under the current version of the Benefit Plan's summary of benefits, the prescription drug benefits provision states:

> *How Does this Program Work?*
> 4.0 Whenever you or an eligible dependent requires a prescription drug, you have the following options for getting your prescription filled:
> - *Mail Service*
>   you can order a 30 to 90-day supply of medicines prescribed for treatment of a chronic or long-term illness (such as arthritis, diabetes, high blood pressure) through the mail from FlexRx.[1]
> - *Local Pharmacy*
>   you can purchase up to a 90-day supply from any pharmacy of your choice; however, there are certain advantages if you obtain your medication from a pharmacy which has agreed with ValueRx[2] to participate in the USX Program.

---

[1] At the time the summary plan description was written, the prescription drug manager was FlexRx, but the parties agree that FlexRx was later replaced by Medco Health Solutions, Inc, which is the current prescription drug manager for the Plan.

[2] ValueRx also has been replaced by Medco as the manager of the local pharmacy option under the Plan.

Paragraph 4.7 of the Benefit Plan summary description, entitled *"What Prescriptions Are Not Covered,"* states the following:

> Except for insulin, this Program does not cover any drugs or medicines that can be purchased over-the-counter, without a prescription, nor does it cover:
>
> - birth control pills even though a prescription is required
> - drugs not medically necessary to treat a condition of illness or injury (such as drugs prescribed for cosmetic purposes), except that prescriptions for nicotine skin patches are covered by [Medco] when purchased at a local pharmacy but not under the [Medco] mail service program; however, coverage is limited to two courses of treatment per person per lifetime.
> - experimental drugs
> - drugs prescribed for weight loss
> - growth hormones
> - drugs prescribed for treatment of infertility
> - allergy serums
> - refills of any prescription older than one year
> - home infusion therapy drugs
>
> In addition, the following are not available under the mail service option:
> - drugs which require refrigeration
> - drugs for acute, short-term illnesses as determined by [Medco] even though prescribed for 30 days or more.
> - 

The parties agree that none of the exclusions stated in paragraph 4.7 specifically covers the Tracleer circumstance of a medication not being available for distribution by the prescription drug manager of the Benefit Plan. There is no admissible evidence[3] that the Benefit Plan's prescription drug

---

[3] Plaintiff has attempted to offer into evidence statements made by an unidentified representative of CVS-Pro Care in telephone conversations with her and with a paralegal employed by her attorney's firm to the effect that a contract does exist under which CVS-Pro Care can make Tracleer available through the Medco mail order option. Aside from these statements being inadmissible hearsay, the court gave the parties an opportunity to conduct additional discovery and present further evidence on this question, but none has been forthcoming. To the extent the plaintiff's affidavits contain hearsay statements made to her and others in telephone conversations, they are stricken and will not be considered by the court.

manager, Medco, has any contract or agreement with any of the specialty distributors of Tracleer that would allow Medco to provide the medication to plaintiff through the Benefit Plan's mail order option. If the mail order option were available to plaintiff, she would be required to pay only an $18.00 per month co-pay for her Tracleer prescription. If not available, she must use the local pharmacy option and pay a 40% co-pay, or approximately $1,200.00 per month from the prescription, which she cannot afford.

### III. Discussion

The United States Court of Appeals for the Eleventh Circuit described clearly, if not succinctly, in <u>HCA Health Services of Georgia, Inc. v. Employers Health Insurance Company</u>, 240 F.3d 982 (11th Cir. 2001), the analysis a court must undertake in reviewing a claims administrator's determination of benefits. There, the court explained:

> In reviewing a claims administrator's benefits determination, the court follows a series of steps. The applicability of heightened arbitrary and capricious review is a result of the court making a specific determination at each step in the analysis. At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry. For ease of application, we lay out these steps below ....
>  First, a court looks to the plan documents to determine whether the plan documents grant the claims administrator discretion to interpret disputed terms. If the court finds that the documents grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review.
>  Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is "wrong." [Footnote omitted] <u>See Godfrey v. BellSouth Telecommunications, Inc.</u>, 89 F.3d 755, 758 (11th Cir. 1996) ("we first conduct a de novo review to decide if the [claims administrator's] determination was wrong."); <u>Brown</u>, 898 F.2d at 1566 n. 12 ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo*

review before a reviewing court is concerned with the self-interest of the fiduciary."); see also Marecek v. BellSouth Telecommunications, Inc., 49 F.3d 702, 705 (11th Cir. 1995) (explaining that when the district court agrees with the ultimate decision of the administrator, it will not decide whether a conflict exists. Only when the court disagrees with the decision does it look for a conflict and, when it finds such a conflict, it reconsiders the decision in light of this conflict).

If the court determines that the claims administrator's interpretation is "wrong," the court then proceeds to decide whether "the claimant has proposed a 'reasonable' interpretation of the plan." Lee v. Blue Cross/Blue Shield, 10 F.3d 1547, 1550 (11th Cir. 1994). Even if the court determines that the claimant's interpretation is reasonable, [footnote omitted] the claimant does not necessarily prevail. At first glance it seems odd that a reasonable interpretation would not automatically defeat a wrong interpretation. The reason the claimant's reasonable interpretation does not trump the claims administrator's wrong interpretation is because the plan documents explicitly grant the claims administrator discretion to interpret the plan. See Brown, 898 F.2d at 1563 (stressing the importance of allowing an insurance company the benefit of the bargain it made in the insurance contract). We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator under the terms of the plan. See Firestone, 489 U.S. at 111, 109 S.Ct. at 954 quoting Restatement (Second) of Trusts § 187 (1959) ("[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion").

To find a claims administrator's interpretation arbitrary and capricious, the court must overcome the principle of trust law [footnote omitted] which states that a trustee's interpretation will not be disturbed if it is reasonable. See , 489 U.S. at 110-11, 109 S.Ct. at 954 (explaining that when a trustee is granted discretion his interpretation will not be disturbed if it is reasonable). Thus, the next step requires the court to determine whether the claims administrator's wrong interpretation is nonetheless reasonable. If the court determines that the claims administrator's wrong interpretation is reasonable, then this wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable.

HCA Health Services of Georgia, Inc. v. Employers Health Insurance Company, 240 F.3d 982, 993-94 (11th Cir. 2001). The first step of the analysis is a determination from the Plan documents whether the claims administrator has been granted expressly the discretion to make eligibility

8

determinations; if so, the "arbitrary and capricious" standard applies. The second step requires the court to decide whether the administrator's claim determination was "wrong" in light of the provisions of the plan documents themselves. Third, if the court decides the administrator's determination is "wrong," the court must assess whether the *claimant* has advanced a reasonable interpretation of the plan documents. If so, the court proceeds to the fourth step, which is a determination of whether the *administrator's* interpretation was reasonable, even if "wrong." If the administrator's determination was "reasonable, even if "wrong," it is entitled to deference, unless the administrator was operating under a conflict of interest. The fifth step of the analysis requires the administrator to demonstrate that the conflict of interest (if any) did not influence the resolution of the claimant's claim.

Turning to the evidence in this case, it is undisputed that the Fund, as trustee and administrator of the Plan, expressly was granted the discretion to interpret the provisions of the Plan and to make eligibility determinations. Since at least November 1, 1997, an explicit provision of the Plan has included the following:

> Effective November 1, 1997, notwithstanding any other provisions of this Plan, the Pension Fund [defendant] shall administer this Plan and shall decide all questions arising out of and relating to the administration of this Plan. Subject to any disputes provisions in the Plan, the decision of the Pension Fund shall be final and conclusive as to all questions of interpretation and application of this Plan and as to all other matters arising in the administration of this Plan. In exercising the discretionary authority to administer, interpret and apply this Plan, the Pension Fund shall be guided by the intent of the Corporation [USS] in establishing the provision being interpreted or applied.

9

Plainly this provision creates the type of discretionary authority described in <u>Firestone Tire & Rubber Co. v. Bruck</u>, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed. 2d 80 (1989), and other cases that have held that the decisions of the administrator are entitled to deference under the "arbitrary and capricious" standard.

  The next issue is whether the Fund's determination is "wrong" that the prescription drug benefit provisions of the Plan do not allow the plaintiff to obtain Tracleer through the mail order option because the prescription drug manager, Medco, is not authorized by the FDA to distribute Tracleer. At this step of the analysis, the court takes a *de novo* look at the Plan documents and decides whether the administrator's determination of the issue is correct or incorrect. Any ambiguity in the language of the Plan document is construed against the administrator as the drafter of the language. <u>HCA Health Services of Georgia, Inc. v. Employers Health Insurance Company</u>, 240 F.3d 982, 993 note 24 (11th Cir. 2001)("When a plan is ambiguous, the principle of *contra proferentem* requires that ambiguities be construed against the drafter of a document; as such, the claimant's interpretation is viewed as correct.").

  In this case, the language of the Plan is ambiguous, subject to two reasonable readings. The Fund contends that the prescription drug provision makes the mail order option available only with respect to those medicines the prescription drug manager is able to obtain and distribute. The Fund points to the statement that "you can order a 30 to 90-day supply of medicines prescribed for treatment of a chronic or long-term illness (such as arthritis, diabetes, high blood pressure) through the mail from [Medco]," as proof that the mail order option can be used only if the medication can be obtained "through the mail from" the prescription drug manager, Medco. But when this language is read in the context of the entire prescription drug benefit, including the exclusionary provisions,

10

it is not at all clear that it was intended to limit the mail order option solely to medications that Medco could actually, physically obtain and mail to the claimant. First, the prescription drug benefit gives the choice to the claimant as to which option to use for securing medication. The introductory clause says, "Whenever you or an eligible dependent requires a prescription drug, *you* have the following *options* for getting your prescription filled..." [Emphasis added]. Nothing in this suggests that the Plan may reduce or eliminate the choice of the mail order option by, for example, selecting a prescription drug manager that has only a very limited array of medications it can distribute. The claimant is free to choose either option and the Plan must accommodate that choice.

Second, none of the explicit exclusions from the mail order option under paragraph 4.7 applies to these circumstances. It would have been simple enough for the prescription drug benefit provisions of the Plan to exclude explicitly from the mail order option any medication the prescription drug manager was not legally authorized to distribute. Yet, such an exclusion is not found in either paragraph 4.0 or 4.7 of the Plan, leaving the provision at least ambiguous as to whether it was intended to cover the instant circumstance or not. In fairness, the drafters of the Plan probably did not anticipate limited-distribution drugs such as Tracleer, but that oversight is construed against the Plan, not the claimant, under the rule of *contra proferentem*.

The court concludes that the plaintiff's interpretation of the language is correct. She retains the choice whether to use the mail order option or the local pharmacy option to obtain her medications, including Tracleer. Having given her that choice, the plan administrator, the Fund, must accommodate the choice and arrange for an authorized Tracleer distributor to provide the medication to her under procedures and costs comparable to the mail order option. Reaching the conclusion, upon a *de novo* reading of the Benefit Plan's prescription drug provision, that the Fund's

11

medication directly available from the prescription drug manager, is consistent with its cost-saving goal. Preserving Plan assets by reducing costs wherever possible is in the best interest of all of the participants of the Plan, even if it may result in a hardship in particular cases, as it does here. Additionally, the Fund's reading of the clause, "you can order a 30 to 90-day supply of medicines prescribed for treatment of a chronic or long-term illness (such as arthritis, diabetes, high blood pressure) through the mail *from* [Medco]" [emphasis supplied], making the mail order option applicable only to medication Medco actually is able to distribute, is not unreasonable. A reasonable reading of the clause includes the implication that mail order medication must come "from" Medco; if Medco is not able to supply a particular medication, for whatever reason, the mail order option simply is not available. Because the Fund's interpretation of this provision is reasonable, even if "wrong," it is due deference from the court.

      Finally, the court concludes that the "heightened arbitrary and capricious" standard does not apply in this case because the administrator did not make its claim determination under the influence of a conflict of interest. There is no evidence that the Fund has a conflict of interest. Although it acts as the trustee of the VEBA, from which benefits are paid, it is a non-profit entity and its revenues, to the extent it has revenues, are not exposed to the payment of benefits. All benefits are paid from a trust, into which USS makes defined contributions. If the benefits exceed the corpus of the trust, neither the Fund nor USS has any additional liability to fund benefits. Thus, because neither the Fund nor USS funds benefits "out of its own coffers," neither has a conflict of interest with respect to determination of claims for benefits.

      Additionally, the court has explored whether the Fund's Board of Directors has a conflict because five of its eleven members are officers of USS. Even if the five USS members of the Board

tend to favor USS in their decisions, there is no evidence that the remaining six, a majority of the Board, owes any allegiance to USS. Furthermore, even if some overriding allegiance to USS could be shown, USS itself has no particular interest in the claims determinations made by the Fund. USS pays a defined contribution to the trust as determined by collective bargaining agreements with various unions. Its contribution to the trust neither rises nor falls based on any claims determinations made by the Fund. Thus, USS is disinterested in the daily operation of the Fund, including its determination of claims for benefits under the Benefits Plan.

Because the Fund has no conflict of interest with respect to its fiduciary duty to make fair claims determinations, the "arbitrary and capricious" standard of review applies to this case, not the heightened standard. Consequently, there is no showing of a conflict the Fund is required to rebut as part of its burden on summary judgment and its determination that plaintiff may not use the mail order option to obtain Tracleer is entitled to deference. Defendant's motion for summary judgment, therefore, is due to be granted.

A separate order granting the defendant's motion for summary judgment will be entered.

DONE this 23rd day of October, 2003.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE